Phillip R. HILLIARD, Plaintiff,

v.

ARMCO STEEL CORPORATION, a corporation, and the Butler Armco Independent Union, Defendants.

Civ. A. No. 71–852.

United States District Court,
W. D. Pennsylvania.

March 10, 1976.

Lucchino, Gaitens & Hough, Pittsburgh, Pa., for plaintiff.

Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., William H. Willcox, Washington, D. C., for Armco Steel Corporation.

Donald D. Doerr, Butler, Pa., for Butler Armco Independent Union.

## OPINION

SCALERA, District Judge.

### I

The plaintiff, Phillip R. Hilliard, filed this action based on § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, et seq., as amended, which named Armco Steel Corporation and the Butler Armco Independent Union as defendants. The gravamen of the complaint is that the Union failed to take Hilliard's discharge to arbitration, thus allowing Armco to improperly discharge him in violation of the collective bargaining agreement.

Both defendants filed motions for summary judgment, which motions were denied.

Trial was held and the parties presented requested findings of fact, conclusions of law and trial memoranda.

### II

Hilliard was discharged in 1969 from his job at the Armco plant in Butler, Pennsylvania. Hilliard was a member of the Union which represents the production and maintenance employees at Armco's Butler plant. The contract between Armco and the Union contained a grievance procedure which constituted "the sole recourse with respect to any claim by an employee of a violation of the Agreement by the Company." Article VI, § 2 B 2.14; Article IX, § A.

Hilliard was an alcoholic. Hilliard's drinking was such that he sought outside medical help in early 1960, and in 1967 and 1968. Hilliard's alcoholic condition in 1969 was preceded by eight to ten years of heavy drinking. In 1963, he was suspended for seven days for coming to work with a heavy hangover. In 1965, he was suspended for sixty days for coming to work under the influence of alcohol. There were numerous instances of bad workmanship and absenteeism. Hilliard was frequently warned about his drinking.

On May 11, 1965, Hilliard was at work under the influence of alcohol. He was suspended for five days subject to discharge. On May 18, 1965, after a hearing, he was discharged. The reasons given were the numerous instances of reporting to work while under the influence of intoxicating liquors and other problems related to his drinking habits, including absenteeism and poor workmanship.

The Union processed Hilliard's 1965 discharge to an informal hearing, at which the discharge was affirmed. The Union carried the grievance to Step III, at which point the Union succeeded in having the discharge converted into a sixty-day suspension. At the Step III proceedings, Hilliard promised to do anything necessary to hold his job. Hilliard did not dispute the fact that he was intoxicated at work nor did he deny his record of drinking problems. He admitted he was an alcoholic. He claimed that his discharge made him realize he could not control his problem without help and that since his discharge in May 1965, he had not had a drink and was attending AA meetings in order to learn how to help himself.

The conversion of the discharge into a suspension was based on the following conditions, with the understanding that a violation of the conditions would result in immediate and final discharge:

1. The grievant is to abstain from the use of alcoholic beverages.

2. He is to continue to avail himself of the "AA" program.

3. He is to consult with the Plant Physician, at intervals determined by the Plant Physician, in order to assess the grievant's progress in controlling his problem.

4. The grievant must maintain satisfactory work and attendance records.

The Union told Hilliard that this was his last chance and that he must comply with the conditions or lose his job. Hilliard did not comply with the terms set forth for his continued employment. Hilliard stopped attending AA meetings in 1967 or 1968.

The written reports of those who treated Hilliard in 1969 show:

a. Plaintiff "freely indicated that he had a rather long history of alcohol related problems"; he stated that "he had multiple absenteeism, frequent warnings in reference to his drinking."

b. He was "best described as a simple alcoholic with no particular psychopathology underlying the addiction. A history indicates a gradual decline into the addiction over a considerable period of time."

c. "Mr. Hilliard admits having an alcoholic problem . . . Mr. Hilliard has a long history of absenteeism. The record indicates that most of the incidents of absenteeism resulted from his problem of alcoholism."

On June 17, 18 and 19, 1969, without giving any prior notice, Hilliard did not report for work, although he was scheduled to report for work from 7:00 a. m. to 3:00 p. m. On the afternoon of June 19, Hilliard called in and asked to be placed on vacation status. He testified that this request was made because he was in such a condition after a heavy drinking episode that he could not drive to work. Hilliard had developed a pattern of missing two days of work and then taking unscheduled vacation. For example, six months before the June 1969 episode, he was absent without notice on two days, December 17 and 18, 1968, and then called his supervisor on the 19th requesting a vacation for the week, which request was granted. The same basic procedure was used in August 1967, when he reported off sick for two days, then called in and converted it to a week's vacation.

Unreported absenteeism is under the contract cause for discharge. The Union agreement provides:

SECTION E—Absenteeism

1. In recognition of the difficulties imposed upon Management through failure of employees to comply with working schedules, an employee reporting late for, or absenting himself from, work without prior notice and without just cause may be subject to such disciplinary action as Management may determine.

Hilliard was an experienced slitter and operated a slitting machine. If he did not report, his machine was either shut down or the company had to summon another employee, which frequently involved paying other operators overtime or doubletime.

After the June 1969 absences, Hal Hamilton, Supervisor of Employee Administration, met with John Hess, Jerry McGrath, and Francis Raabe, who were Hilliard's superiors, to decide what to do with Hilliard. They reported that Hilliard again had a problem with alcoholism; that there was no improvement in his behavior; that Hilliard was absent from work often, and that the quality of his work was poor. This management group decided to suspend Hilliard for five days subject to discharge.

The Union immediately instituted a grievance on Hilliard's behalf. At the first hearing in the grievance procedure, the discharge was affirmed. At the hearing, the management personnel present were McGrath, Raabe, and Hamilton. The record of this hearing states:

During the hearing, the incidents leading to your suspension and discharge were thoroughly reviewed. You agreed that the facts as presented were correct.

Your not reporting for work as scheduled on 16, 17 and 18 was clearly the result of your continued use of intoxicative beverages. You have had previous suspensions because your problem with alcohol had affected your work and attitude.

Your superiors and the Works Physician have worked with you to help you overcome this problem. Unfortunately, all efforts to help you rehabilitate have been to no avail. You have broken specific written conditions that you agreed to abide by when you returned to work after your last suspension.

We have no alternative but to discharge you.

The Union on Hilliard's behalf appealed the grievance to Step III. Another hearing

was held on July 8, 1969, and the decision of July 14 states:

> This hearing was held to review the facts pertinent to the discharge of Phillip R. Hilliard.
>
> The facts leading to the suspension and subsequent discharge of Mr. Hilliard were not contested and showed an "inching away" from the terms specified for his continued employment in a previous grievance. This trend was culminated in a flagrant violation of rules that left the Company no alternative to instituting discharge procedure.
>
> In view of the history and facts of this case, it is the sincere belief of the Company that Mr. Hilliard must face reality on his own to best deal with his problem.
>
> The history, facts, and concern for the involved individual mandate that this discharge is hereby sustained.

The Union took Hilliard's grievance to Step IV and another hearing was held on September 30, 1969. The decision of that hearing states:

> In this grievance, Mr. Hilliard seeks reinstatement with the Company following his discharge for absenteeism.
>
> There is no dispute concerning the facts leading to the suspension and subsequent discharge of the grievant. Further, Mr. Hilliard admits having an alcohol problem, but he—and the Union on his behalf—contend that he is now rehabilitated. It is on this basis that they seek reinstatement.
>
> Mr. Hilliard has a long history of absenteeism. The record indicates that most of the incidents of absences resulted from his problem of alcoholism. He was discharged in May, 1965 as a result of this problem, but was returned to work 60 days later on a "last chance" basis following his assurances that he recognized his problem and was taking positive corrective steps concerning it. However, the record reveals that upon return to work he had a gradual relapse into his old ways, culminating in his failure to report as scheduled on June 17, 1969.

> Clearly, Mr. Hilliard was discharged for just cause and after due consideration. Nevertheless, the request for reinstatement on the basis of asserted rehabilitation has been thoroughly considered. However, it is concluded after a searching review of all the circumstances of this case, that a decision to reinstate Mr. Hilliard is not warranted.
>
> Grievance denied.

After the Step III denial of his grievance, Hilliard went to Chit-Chat Farms for its twenty-eight-day alcoholic program. Gerald Shulman, the clinical psychologist, advised the company that Hilliard was an alcoholic; had made good progress in identifying as an alcoholic; appears to be sincerely motivated for recovery, and that the overall prognosis "would be fair to good." Dr. Browne, plaintiff's expert, when asked about this twenty-eight-day program, testified, "In 28 days you're not going to cure anything," and that after such visits some people still continue to drink.

The Union, utilizing the Chit-Chat letter, argued at Step IV that Hilliard was rehabilitated and should be rehired. The Union made this plea even though it had been advised that Hilliard was still drinking. At all these hearings, Hilliard was present and agreed with the facts presented. Hilliard complimented the Union on the fine presentation made on his behalf in the hearings.

After three hearings and three refusals by three different levels of management to reinstate Hilliard, the Union then had the problem of determining whether to press the grievance to arbitration. The grievance committee met and considered all of the facts, including the 1965 grievance proceedings; Hilliard's admission that he was still drinking heavily; his absences from work; the repeated warnings that the Union officers had given him concerning drinking, as well as the fact that it was common knowledge throughout the plant that Hilliard was again drinking heavily.

The members of the committee unanimously agreed that Hilliard's discharge should not be taken to arbitration. The grievance committee of the Union consisted

of seven members, three elected officers of the Union and four elected departmental representatives, who are appointed to the committee. For many years, these members had been active in Union affairs and had been involved in various grievance proceedings. Each of them was fully aware of the seriousness of a discharge because it terminates an employee's job and his opportunity to receive a pension on retirement from Armco. In determining not to go to arbitration, the committee concluded that Hilliard's discharge was for good cause and that there was no violation of the contract.

The decision not to proceed to arbitration was communicated to Hilliard and also to the Union membership at the next Union meeting. No objection was made by anyone to this decision, including Hilliard. Each member of the grievance committee, in deciding not to submit the claim to arbitration, exercised his own independent judgment in a fair and unbiased manner. No member of the grievance committee had any hostility or personal grudge against Hilliard.

### III

■ When, as in this case, a union refuses to prosecute a member's discharge grievance to final arbitration, the grievant may bring an action under § 301 of the Labor Management Relations Act joining both the union and the employer as defendants. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). To prevail in such a suit, however, plaintiff must show "that the union, as bargaining agent breached its duty of fair representation in its handling of the employee's grievance." *Vaca v. Sipes, supra,* 386 U.S. at page 186, 87 S.Ct. at page 914, 17 L.Ed.2d at page 855. Otherwise, the entire cause of action as it runs against both defendants must fail. *Vaca, supra; Hubicki v. ACF Industries, Inc.,* 484 F.2d 519 (3d Cir. 1973).

In *Hubicki, supra,* the plaintiff-employee first sued his former employer. The District Court granted the motion of the defendant for summary judgment. The Circuit Court in affirming noted at page 522:

"Since Hubicki did not assert lack of fair representation on the part of his union and since he did not allege or show any attempt to use the contract grievance procedure, we believe that the district court properly concluded that plaintiff failed to state a cause of action upon which relief could be granted."

The plaintiff filed a second suit against his union alleging that the union had "arbitrarily, capriciously and without reasonable cause refused to employ the contract grievance machinery to protect his interests." *Hubicki, supra,* page 523. Plaintiff amended his complaint joining the former employer ACF as a defendant. The District Court granted the motion for summary judgment for the defendant company on the grounds of res judicata, and for the defendant union "on the ground that, viewing all the evidence in the light most favorable to the plaintiff, there were no facts alleged to raise a triable issue of arbitrary, capricious or bad faith conduct on the part of the union." *Hubicki, supra,* page 525. The Circuit Court affirmed, citing *Vaca, supra.*

■ A breach of the union's statutory duty of fair representation can occur only when the union's official relationship with a member of the collective bargaining unit is "arbitrary, discriminatory, or in bad faith." *Vaca, supra,* 386 U.S. page 190, 87 S.Ct. page 916, 17 L.Ed.2d page 857.

■ The actual propriety of the grievant's discharge is immaterial to the strength of a *Vaca*-type action; the real issue is whether or not the union acts in good faith when it determines that the discharge is proper within the meaning of the applicable collective bargaining agreement.

■ Thus, a discharged employee may not sue his former employer if a collective bargaining agreement is in effect which provides for a grievance procedure, except through the medium of an action under § 301 of the Labor Management Relations Act, and then only if he asserts and proves lack of fair representation on the part of his union. This is so even if the grievance has merit.

## IV

■ The thrust of Hilliard's argument is that his alcoholism was an illness within the meaning of Article VIII § M, for which he should have been given a leave of absence. If Hilliard's interpretation of Article VIII § M and the supporting contract provisions are correct, he argues that his discharge was improper.

Section M states in part that:

"Any employee who is known to be ill or disabled, whose illness or disability is supported by evidence satisfactory to the Plant Physician, will be granted sick leave automatically for the period of such illness or disability. . . .

The evidence submitted at trial proves that (1) the Union did not negotiate the contract or understand its terms to excuse alcohol-related offenses against an employee's work responsibilities, and (2) the Union had aided Hilliard in the past but determined that in this instance arbitration could not save him from discharge.

In negotiating and implementing the contract, the testimony indicates that neither the company nor the Union, who were the only parties to the contract, ever intended or understood § M to apply to employees addicted to alcohol and the clause has never been applied to such employees. Both the Union and management negotiators testified that this clause was never intended to apply to alcoholics and had never been applied to them. Other alcoholics had been discharged and this provision was not applied. Further evidence that this section was not thought to apply to alcoholics is the fact that in 1971 the Union sought during negotiations to obtain a provision in the contract for a leave of absence for alcoholics.

Although in recent years alcoholism has been classified as a disease and even though this may be the more enlightened opinion, it is apparent that this view is not unanimous. Dr. Browne, plaintiff's expert on alcoholism, conceded that there are many physicians, psychiatrists and lay people who do not consider alcohol to be a disease. He testified:

Q. And even today the American Medical Association although they are very tardy, there are still those doctors who argue and contend it is not a disease, are there not?

A. Oh, yes.

Q. And there's still psychiatrists today who argue and contend it is not a disease, do they not?

A. That's right. They look upon it primarily as a symptom of other diseases.

Q. And the debate as to whether it's a disease or not or whether it's merely a symptom of some other illness is still raging today?

A. Among some psychiatrists. I don't number myself among them.

* * * * * *

Q. Now, would you also agree that as you go down the level lower to people who are not in the medical or psychiatric field that there are still those who contend today that it is not a disease but is a weakness or a self-inflicted or is a criminal matter to be handled by criminal courts?

A. Yes. There are quite a few who view it in that way.

Dr. Browne also testified that for a disorder to be called a disease, it must be so classified in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. This Manual defines alcoholism as a disease and sets forth three categories of alcoholism: (1) episodic excessive drinking (intoxication 4 times a year); (2) habitual excessive drinking (intoxicated more than 12 times a year); and (3) alcohol addiction. Dr. Browne, incidentally, was of the opinion that only the third category was a disease, differing from the Manual and the view of other experts.

In evidence is the fact that prior to 1956, the American Medical Association did not classify alcoholism as a disease. The contract provision was in existence prior to 1956.

Also in evidence is a publication issued by the company in 1972 calling alcoholism a

disease. This very publication, however, pointed out that the company still had the right to discharge alcoholics, thus reinforcing the evidence that neither the company nor Union viewed § M as being applicable to alcoholics.

## V

The evidence does not support a finding of a breach of the Union's duty of fair representation. Indeed, the evidence indicates that the Union acted properly and in good faith. Thus, under the law, the plaintiff cannot recover from the Union or the company.

The evidence presented by plaintiff to the effect that alcoholism is a disease and that the plaintiff therefore should have been treated as an employee with an illness under that provision of the contract providing for leaves of absence in such cases does not support plaintiff's position. Even if this evidence did support plaintiff's position adequately, it is the law that proof that the Union acted negligently or exercised poor judgment, or perhaps was not aware of the proper and advanced attitude towards alcoholism would not support a claim of unfair representation. But aside from this proposition, the evidence merely indicated at its best that there is a substantial body of opinion which considers alcoholism to be a disease; that this may be the more enlightened viewpoint; and that employees who are alcoholics should be treated as persons with an illness.

The evidence submitted in this case concerning the proper classification of alcoholism only served to strengthen the inference that the Union acted in a fair and reasonable manner. We conclude that plaintiff has failed to prove that the Union breached its duty of fair representation and failed to prove that plaintiff's discharge was without just cause, and an appropriate order will be entered in favor of the defendants.